## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **Ebony Tramel,** *Plaintiff*, v. **National Credit Systems, Inc.,** *Defendant*. | Case No. _____<br><br>Ad Damnum: **$3,000 plus Fees & Costs**<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Ebony Tramel** ("**Ms. Tramel**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendant, **National Credit Systems, Inc.** ("**NCS**"), stating as follows:

### PRELIMINARY STATEMENT

1. This is an action brought by Ms. Tramel against NCS for violations of the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et. seq.* ("**FDCPA**") and the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et. seq.* ("**FCRA**").

### JURISDICTION AND VENUE

2. Subject matter jurisdiction arises under the FDCPA, 15 U.S.C. § 1692k(d), the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331.

3. NCS is subject to the provisions of the FDCPA and the FCRA and to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

4. Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action occurred within this District.

### PARTIES – Ms. Tramel

5. **Ms. Tramel** is a natural person who resides in the City of Tampa, Hillsborough County, Florida, and a *Consumer* as defined by the FDCPA, 15 U.S.C. § 1692a(3), and the FCRA, 15 U.S.C. § 1681a(c).

### PARTIES – NCS

6. **NCS** is a Georgia corporation, with a principal business address of 3750 Naturally Fresh Blvd., Atlanta, GA 30349.

7. NCS is registered to conduct business in the State of Florida, where its Registered Agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.**

8. NCS is a *Debt Collector* within the meaning of the FDCPA, 15 U.S.C. §1692a(6), in that it uses an instrumentality of interstate commerce, including postal mail, for its business, the principle purpose of which is the collection of debts, and / or it regularly collects, directly or indirectly, debts owed or due or asserted to be owed or due to another.

9. NCS is licensed as a *Consumer Collection Agency* ("**CCA**") by the Florida Office of Financial Regulation, holding license number **CCA0900180**. **SEE PLAINTIFF'S EXHIBIT A.** As a CCA, NCS knows or should know the requirements of the FDCPA and FCRA.

## FACTUAL ALLEGATIONS

### The "Debt" – Oakhurst Bills For Rent Months After Move-Out

10. In May 2013, Ms. Tramel rented an apartment for her personal use with Oakhurst Square Apartments ("**Oakhurst**").

11. The monthly rent, pursuant to the lease, was $559. **SEE PLAINTIFF'S EXHIBIT B.**

12. Oakhurst was built in the early 1970s and the majority of its tenants receive Section 8 housing subsidies.

13. Buildings at Oakhurst were in a near-constant state of disrepair, with little to no security measures taken to protect tenants.

14. Criminal activities, from drug dealing to violent felonies, were commonplace throughout the time when Ms. Tramel lived at Oakhurst.

15. Oakhurst failed to provide "common sense, yet critical, security and safety measures necessary to ensure the safety of the guests and residents," according to the mother of Freddy Demond Benson, who was killed in a drive-by shooting at Oakhurst in June 2016; *see Valarie Kikiya Benson vs. Ashley Glen Land Holdings LLC, d/b/a Oakhurst Square Apartments*; case 2018-CA-003434, Hillsborough County, Florida.

16. Indeed, one resident at Oakhurst, Alexa Pugh, told the *Minaret* newspaper, published by the University of Tampa, in February 2018, "When it gets dark, I don't want to be walking around here, even when it's day I sometimes don't feel safe. What I would tell you is to make sure you have something to protect yourself with when you walk around here, like a Taser, a knife or something."

17. Oakhurst failed to maintain a habitable environment in many respects.

18. In 2016, a water pipe burst in the unit above Ms. Tramel's apartment, causing water to pour directly into Ms. Tramel's apartment.

19. Video taken on Ms. Tramel's cell phone shows what appears to be six to nine inches of standing water in her bathroom and hallways from the flooding.

20. Ms. Tramel's furniture and belongings were damaged by the flooding, as were the belongings of Ms. Tramel's school-age daughter.

21. Oakhurst did little to remediate; Ms. Tramel was left mostly on her own to clear out the water from her apartment.

22. Due to Florida's humid tropical environment, black mold and other dangerous biological agents grow easily.

23. Large amounts of black mold and other organisms began festering inside Ms. Tramel's apartment.

24. The smell from the water leak, some of which contained raw sewage, and the ensuing black mold became increasingly difficult for Ms. Tramel and her daughter to bear.

25. The conditions in the apartment caused Ms. Tramel's daughter to become ill.

26. Ms. Tramel's complaints to management went nowhere; Ms. Tramel, in desperation, reached out to a local television station, Channel 13, a FOX affiliate, hoping their consumer affairs reporter might look into the matter further.

27. Ms. Tramel advised Oakhurst around February 2017 that for health and safety reasons, and for the welfare of her child, she could not continue to live in an apartment with festering black mold, the lingering smell of sewage, and other safety concerns.

28. Ms. Tramel then moved out based on Oakhurst's breach of its obligation under the lease to provide habitable housing to Ms. Tramel.

29. Assuming, arguendo, that Ms. Tramel did not have a right to leave Oakhurst's apartment based on Oakhurst's breach, Ms. Tramel provided ample notice, consistent with the lease and would not be obligated to pay rent beyond April 2017, at the latest.

30. Despite all of this, Oakhurst continued to charge her monthly rent, even though she had surrendered the apartment and was not occupying it.

31. Upon information and belief, despite Ms. Tramel having left and her unit remaining empty, Oakhurst continued to collect Section 8 funds for "rent" from the Tampa Housing Authority – an agency which provides housing assistance with money received from the federal Department of Housing and Urban Development.

32. On July 21, 2017, Oakhurst filed for eviction in Hillsborough County court, claiming "Defendant(s) failed to pay rent due on or before June 9, 2017 of $2,840." **SEE PLAINTIFF'S EXHIBIT C.**

33. Mathematically, this means Oakhurst alleged that no rent had been paid at all since February 2017.

34. Service of process was effected by posting a copy of the summons on the door of the then-vacant apartment where Ms. Tramel had previously lived.

35. Oakhurst had no legitimate need to hire an attorney to file for eviction in July 2017 since it had already taken possession of the unit some months prior; despite this, Oakhurst tacked on $490 for "attorney or legal charges" to the debt it claimed Ms. Tramel owed.

36. Oakhurst also charged Ms. Tramel $450 for cleaning and damage charges relating to cleaning up the mess that Oakhurst's own defective plumbing caused.

37. In August 2017, a default judgment for eviction was granted to Oakhurst.

38. On August 31, 2017, Jonathan Carlton, for the Hillsborough County Sheriff's Office, served the writ of possession, remarking in his affidavit "POSTED 08-31-17 AT 1040 HOURS BY J CARLTON 2762, NO CONTACT/EVICITON EXECUTED/PLAINTIFF TOOK POSSESSION OF THE PROPERTY." **SEE PLAINTIFF'S EXHIBIT D.**

39. Despite the certification from the Hillsborough County Sheriff's Office that possession had been restored on August 31, 2017, Oakhurst **continued to charge** Ms. Tramel rent, as well as, presumably, the Tampa Housing Authority.

40. Oakhurst's "Final Account Statement" shows a $536 charge for rent between Sept. 1, 2017 and September 26, 2017. **SEE PLAINTIFF'S EXHIBIT E.**

41. Oakhurst had no legal basis to continue to bill for rent after receiving possession of the apartment from Ms. Tramel in February 2017, or at the very latest,

April 2017, nor did it have any basis to continue to charge rent after the Hillsborough County Sheriff's department returned possession to it in August 2017.

42. In October 2017, Oakhurst placed the Debt with NCS for collection, alleging an astounding $5,408 was owed to it.

43. In January 2018, NCS began reporting the Debt to various *Consumer Credit Reporting Agencies* ("**CRAs**"), including Equifax, Experian, and Trans Union, alleging a $5,408 debt owed to Oakhurst. **SEE PLAINTIFF'S EXHIBIT F.**

44. When making reports to a CRA, a debt collector reports a value for the *Equal Credit Opportunity Act Code* ("**ECOA Code**") using Metro 2 codes, which are standardized codes used by the major CRAs as a common trade language.

45. Equifax and Experian all require furnishers of data to comply with the instructions of the *Credit Reporting Resource Guide,* published by the *Consumer Data Industry Association* ("**CDIA**"), a trade association representing the CRAs and which updates and implements the Metro 2 reporting language.

46. Metro 2 requirements include reporting an accurate *Date of First Delinquency* ("**DOFD**"), which, as the term implies, is the first time which the debt became past-due.

47. The CRAs use the DOFD reported by a data furnisher to comply with and compute the running of the seven-year reporting period prescribed by the FCRA.

48. After the expiration of the reporting period, the CRAs purge the tradeline as obsolete and no longer include it in reports generated about the consumer.

49. Failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of a willful violation of the FCRA. *See Gillespie v. Equifax Info. Servs., LLC*., No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

50. NCS reported that the DOFD of the Debt was **September 26, 2017**. **SEE PLAINTIFF'S EXHIBIT G.**

51. This DOFD is false, since Oakhurst itself had sued for eviction in July 2017, claiming five months of unpaid rent; likewise, the DOFD is almost a month after a final writ of possession was served upon the unoccupied apartment where Ms. Tramel formerly resided.

52. NCS knew, or should have reasonably known, that the DOFD which it reported was impossible – the original creditor claimed on July 21, 2017, that the Debt was already past due and filed a lawsuit in the public records of Hillsborough County memorializing as much.

53. Clearly, a debt that was "first" delinquent on September 26, 2017, would not subject a consumer to an eviction lawsuit for nonpayment of rent in July 2017, or cause a writ of possession to be posted, evicting the consumer, in August 2017.

54. NCS "re-aged" the Debt in an attempt to influence Ms. Tramel's decision-making process regarding the Debt, since the longer a debt appears on one's credit, the longer it will adversely affect such credit, and the more likely a consumer will be to pay it, even if they dispute it.

55. Credit reporting is one of the most effective and powerful tools at NCS' disposal to collect debts, especially since inexpensive tenant screening websites abound, allowing prospective landlords to quickly and easily obtain credit bureau reports regarding a prospective renter.

56. Virtually all Hillsborough County landlords would decline to rent to a tenant who shows a purported $5,000+ debt owed to a past landlord.

57. Credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms … the refusal to correct mistaken information can only be seen as an attempt to tighten the screws on a nonpaying customer." *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993).

58. The longer NCS can keep its tradeline appearing on Ms. Tramel's report, the longer it has to attempt to collect the Debt from Ms. Tramel, and the more coercive that tradeline is.

59. A communication to a CRA is "material" if it affects the consumer's "ability to choose intelligently how to handle her debt situation." *See Daley v. A & S Collection Associates, Inc.,* CV-09-946-ST (D. Oregon June 7, 2010) (holding that the false reporting of the date of delinquency was a material violation of 15 U.S.C. § 1692e(8)).

60. Credit scoring algorithms weigh the recency of a default on a debt when computing a credit score, reflecting more recently delinquent accounts as worse than similar older accounts.

61. Thus, NCS' re-aging of the Debt by reporting a false DOFD harmed Ms. Tramel in the form of lower credit scores.

62. "When a trade line is improperly re-aged so that it expires after the seven-year time limit has run, (e.g., a trade line that would properly expire in 2018, is set to expire in 2020) there is a real risk that the individual will be harmed, in the form of a lower credit score." *O'Dell v. National Recovery Agency*, Civil Action No. 16-5211, (E.D. Penn. 2018) (finding that the re-aging of debt via a false DOFD creates a real risk of harm sufficient to create standing to bring claim).

63. NCS' actions were not constrained to Ms. Tramel. NCS frequently reports false DOFDs – stating that they are more recent in an attempt to re-age debts and extend the period of time for which they can be reported.

64. NCS has been sued multiple times by other consumers alleging this exact behavior.

### NCS' Attempts to Collect Through its Website

65. At various points in time, NCS sent correspondence in the mail to Ms. Tramel, which contained the URL for NCS' website, containing what NCS asserts are "helpful" videos.

66. However, these videos are only helpful to NCS in its crusade to recover delinquent debts.

67. NCS' website offers three videos, the second of which is titled, "What will happen if I ignore the debt or refuse to pay?" **SEE PLAINTIFF'S EXHIBIT H.**

10

68. NCS makes these videos available to any consumer from whom NCS is collecting a debt, regardless of whether the creditor intends to take legal action or not, or whether the alleged debt is too old to be legally enforced.

69. The video is narrated and delivered by a well-dressed, distinguished-looking man, who speaks in artfully enunciated English, creating an air of authority and *gravitas*.

70. The video begins with the speaker indicating that the video is an attempt to collect a debt and any information obtained will be used for that purpose.

71. The speaker then states:

> The burden of bad debt doesn't just magically disappear. Ignoring legitimate debt can have significant consequences and negatively impact several areas of your life… National Credit Systems' policy is to report all unpaid accounts to the three national credit bureaus.

72. The speaker later states:

> In addition to damaging your credit, the law allows creditors other recovery options. In some cases, a creditor may obtain a judgment against you. Your creditor may then ask the court to issue a writ of garnishment against your wages and bank account. This can result in more cost and embarrassment since your paycheck is now involved. So this also means your employer is aware of your situation.

73. Even if a particular consumer's debt is still legally enforceable, the majority of landlords, for whom NCS collects, do not take legal action to recover unpaid debts, such as Oakhurst.

74. Even those landlords who *sometimes* take legal action to recover alleged debts do not *always* take legal action.

75. By giving such consumers the false impression that legal action is likely in the event of nonpayment, NCS is able to collect debts more easily.

76. Similarly, the video falsely implies that a creditor can simply "obtain judgment" from a court for an unpaid debt, *e.g.,* the creditor need merely inform the court that a particular debtor has failed to pay and the court will automatically provide the creditor with a judgment.

77. The video paints a false narrative for an unsophisticated consumer regarding how the legal system works and intentionally omits that judgment cannot be obtained by any creditor without first filing a complaint, serving the consumer, and *proving its claim by a preponderance of evidence*.

78. The video also fails to mention that the consumer can stop any judgment from being obtained by the creditor, even if the creditor sues, by successfully challenging the legitimacy or accuracy of the debt – which would certainly be a viable option for Ms. Tramel, who was being charged for nearly a half years' worth of rent after moving out, and even charged rent for almost a month after a writ of possession was served by a sheriff, despite having no ongoing legal obligation to pay rent.

79. NCS' website offers another video titled, "I've been contacted by a collection agency. What should I do?"

80. In this video, the same speaker advises consumers that while NCS will seek verification of a disputed amount from its client "if appropriate," the consumer/viewer should "keep in mind that it's very important to have supporting evidence of [their] claim if [they are] disputing [their] balance."

12

81. This statement is misleading, as it suggests that a consumer must have evidence to dispute a debt when it is entirely within a consumer's rights to dispute a debt for any reason, regardless of evidence.

82. Indeed, it would be virtually impossible for an unsophisticated consumer to disprove a negative where she moved out of an apartment for legitimate reasons but continued to be billed rent anyway.

*83.* In any matter, a debt collector must consider and treat any debt as "disputed" so long as the consumer indicates she disputes it; there is no requirement that a consumer provide the debt collector with any reason or rationale for his dispute. *See DeKoven v. Plaza Assocs.*, 599 F.3d 578, 582 (7th Cir. 2010) ("[A] consumer can dispute a debt for 'no reason at all'").

84. NCS' suggestion that the consumer must have a reason, as well as evidence, would have the net effect of persuading unsophisticated consumers to not dispute any debt for which they lack evidence.

85. An unsophisticated consumer in receipt of NCS' letter and videos would believe she had the burden to provide documentation proving the debt was invalid, a misrepresentation that affects such consumer's ability to properly respond to the collection effort.

### Ms. Tramel's Dispute of the Debt

86. At various points in time, Ms. Tramel disputed the Debt to NCS, explaining the Debt was not legitimately owed.

87. However NCS continued to report the Debt to the CRAs as a valid, enforceable debt.

88. In November 2019, Ms. Tramel disputed the accuracy of NCS' information to Equifax.

89. Equifax, in turn, sent NCS an *Automated Consumer Dispute Verification Request* ("**ACDV**") through an online system known as e-OSCAR and asked that NCS make a reasonable investigation into the dispute.

90. When responding to an ACDV through e-OSCAR, the respondent must attest that:

> "(b)y submitting this ACDV, you certify that you have verified the accuracy of the data in compliance with all legal requirements, and your computer and/or manual records will be adjusted to reflect the changes noted."

91. The ACDV contains a section which indicates the name of the original creditor and how it is published in the consumer's credit file, as well the DOFD.

92. NCS thereafter responded to the ACDV and, other than updating the status to "disputed," verified that its report was accurate – including the preposterous $5,408 balance and the DOFD of September 26, 2017. **SEE PLAINTIFF'S EXHIBIT I.**

93. NCS failed to make a reasonable investigation into Ms. Tramel's dispute. Any reasonable investigation would have determined the debt could not possibly be correctly reported since: (a) it included rental charges for September 2017, after the rental period, although a Hillsborough County deputy sheriff returned possession of the apartment to Oakhurst in August 2017 by posting a writ of possession and certifying that

Oakhurst was in possession of the unit in August 2017; and, (b) the DOFD was reported as September 26, 2017, a logical impossibility under the circumstances.

94. If a furnisher like NCS decides to report disputed information as verified, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Hinkle v. Midland Credit Management, Inc*. (11th Cir.) 827 F.3d 1295 (2016).

95. On information and belief, NCS was not in possession of any information suggesting the data it reported was true.

96. Around December 10, 2019, Ms. Tramel again disputed the Debt to Equifax.

97. Equifax sent another ACDV and NCS once again verified its information was "accurate" within a few weeks.

98. For the same reasons as before, NCS' investigation was not reasonable.

99. Reporting a debt to a CRA is an attempt to collect the debt alleged therein.

100. NCS continues to make new reports regarding the Debt to the CRAs monthly, and, as of the date of this filing, continues to report the Debt with a false DOFD of September 26, 2017.

101. Ms. Tramel has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FDCPA

102. Ms. Tramel adopts and incorporates paragraphs 1 – 101 as if fully stated herein.

103. NCS violated **15 U.S.C. § 1692e and 1692e(10)** when it used a *false representation and deceptive means* in connection with the collection of a consumer debt by:

   a) reporting to the CRAs, and confirming as accurate upon dispute, that $5,408 was owed to Oakhurst, when this amount contained numerous improper charges;

   b) reporting a false DOFD to the CRAs and confirming the DOFD as accurate upon dispute; and,

   c) claiming via its website that a consumer must provide "detailed" documentation to dispute a debt, when this is not true.

104. NCS violated **15 U.S.C. § 1692e2(a)** when it made a *false representation of the character, amount, or legal status of a debt* in connection with the collection of a consumer debt by:

   a) claiming that $5,408 was owed to Oakhurst, when this amount contained numerous improper charges;

   b) reporting a false DOFD to the CRAs and confirming the DOFD as accurate upon dispute; and,

   c) claiming via its website that a consumer must provide "detailed" documentation to dispute a debt, when this is not true.

105. NCS violated **15 U.S.C. § 1692e(8)** when it *communicated credit information which was known to be false*, or should have been known to be false, in its reports to the CRAs, specifically that $5,408 was legitimately owed to Oakhurst and that the DOFD was September 26, 2017.

106. NCS violated **15 U.S.C. § 1692f(1)** when it attempted to collect amounts not authorized by contract or law, to wit, at least $536 of "rent" from September 1, 2017 through September 26, 2017 – a period of time Ms. Tramel could not possibly have been living at Oakhurst, pursuant to an affidavit from the Hillsborough County Sherriff's Office, and at which time no lease would have been in effect.

107. As a result of the foregoing violations of the FDCPA, Ms. Tramel is entitled to statutory damages and recovery of her attorneys' fees and expenses.

**WHEREFORE**, Ms. Tramel respectfully requests this Honorable Court to enter judgment in her favor and against NCS as follows:

a. Statutory damages of **$1,000.00** pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b. Unspecified actual damages pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d. Such other relief that this Court deems just and proper.

### COUNT II
### VIOLATIONS OF THE FCRA

108. Ms. Tramel adopts and incorporates paragraphs 1 – 101 as if fully stated herein.

109. NCS violated **15 U.S.C. § 1681s-2(b)** by *failing to make a reasonable reinvestigation after receiving notice of dispute from a CRA*, Equifax, on two different occasions, since any reasonable investigation would have determined that the amount of the Debt could not possibly be true and that the DOFD was reported falsely.

110. NCS violated **15 U.S.C. § 1681s-2(b)** by failing to update, modify, or correct its report after receiving notice of dispute from a CRA, Equifax, when it confirmed its report was accurate.

111. NCS' actions were both willful and reckless as its policies at the time specifically called for NCS to falsely report, and confirm as accurate upon dispute, a re-aged DOFD.

112. NCS' conduct renders it liable under the FCRA to Ms. Tramel in a statutory amount up to $1,000 *per incident*, as well as for other damages provided under the statute.

**WHEREFORE,** Ms. Tramel respectfully requests this Honorable Court to enter judgment in her favor and against NCS as follows:

a. The greater of Ms. Tramel's actual damages or statutory damages of $1,000 per incident (for a total of **$2,000**), pursuant to 15 U.S.C. § 1681n(a)(1)(A), 15 U.S.C. § 1681n(a)(1)(B) and / or 15 U.S.C. § 1681o(a)(1);

b. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3),

c. Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ms. Tramel hereby demands a jury trial on all issues so triable.

Respectfully submitted on January 21, 2020, by:

        **SERAPH LEGAL, P. A.**
        /s/ *Brandon D. Morgan*
        Brandon D. Morgan, Esq.
        Florida Bar No.: 1015954
        bmorgan@seraphlegal.com
        /s/ *Thomas M. Bonan*
        Thomas M. Bonan, Esq.
        Florida Bar No.: 118103
        tbonan@seraphlegal.com
        2002 E. 5th Avenue, Suite 104
        Tampa, FL 33605
        Tel: 813-567-1230
        Fax: 855-500-0705
        *Attorneys for Plaintiff*

**ATTACHED EXHIBIT LIST**

| | |
|---|---|
| A | NCS' Florida CCA License Record |
| B | Ms. Tramel's Residential Lease Agreement |
| C | Oakhurst's Eviction Suit against Ms. Tramel, filed July 21, 2017 |
| D | Writ of Possession |
| E | Oakhurst's Final Account Statement |
| F | Ms. Tramel's Experian Consumer Disclosure, November 19, 2019, Excerpt |
| G | Ms. Tramel's Equifax Consumer Disclosure, January 3, 2020, Excerpt |
| H | Screenshot of NCS' website, last visited January 14, 2020 |
| I | Ms. Tramel's Equifax Dispute Results, December 8, 2019, Excerpt |